(Slip Opinion)

# Designating an Acting Attorney General

The President's designation of a senior Department of Justice official to serve as Acting Attorney General was expressly authorized by the Vacancies Reform Act. That act is available to the President even though the Department's organic statute prescribes an alternative succession mechanism for the office of Attorney General.

The President's designation of an official who does not hold a Senate-confirmed office to serve, on a temporary basis, as Acting Attorney General was consistent with the Appointments Clause. The designation did not transform the official's position into a principal office requiring Senate confirmation.

November 14, 2018

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

After Attorney General Jefferson B. Sessions III resigned on November 7, 2018, the President designated Matthew G. Whitaker, Chief of Staff and Senior Counselor to the Attorney General, to act temporarily as the Attorney General under the Federal Vacancies Reform Act of 1998, 5 U.S.C. §§ 3345–3349d. This Office had previously advised that the President could designate a senior Department of Justice official, such as Mr. Whitaker, as Acting Attorney General, and this memorandum explains the basis for that conclusion.

Mr. Whitaker's designation as Acting Attorney General accords with the plain terms of the Vacancies Reform Act, because he had been serving in the Department of Justice at a sufficiently senior pay level for over a year. *See id*. § 3345(a)(3). The Department's organic statute provides that the Deputy Attorney General (or others) may be Acting Attorney General in the case of a vacancy. *See* 28 U.S.C. § 508. But that statute does not displace the President's authority to use the Vacancies Reform Act as an alternative. As we have previously recognized, the President may use the Vacancies Reform Act to depart from the succession order specified under section 508. *See Authority of the President to Name an Acting Attorney General*, 31 Op. O.L.C. 208 (2007) ("*2007 Acting Attorney General*").

We also advised that Mr. Whitaker's designation would be consistent with the Appointments Clause of the U.S. Constitution, which requires the President to obtain "the Advice and Consent of the Senate" before appointing a principal officer of the United States. U.S. Const. art. II, § 2, cl. 2. Although an Attorney General is a principal officer requiring Senate

1

confirmation, someone who temporarily performs his duties is not. As all three branches of government have long recognized, the President may designate an acting official to perform the duties of a vacant principal office, including a Cabinet office, even when the acting official has not been confirmed by the Senate.

Congress did not first authorize the President to direct non-Senate-confirmed officials to act as principal officers in 1998; it did so in multiple statutes starting in 1792. In that year, Congress authorized the President to ensure the government's uninterrupted work by designating persons to perform temporarily the work of vacant offices. The President's authority applied to principal offices and did not require the President to select Senate-confirmed officers. In our brief survey of the history, we have identified over 160 times before 1860 in which non-Senate-confirmed persons performed, on a temporary basis, the duties of such high offices as Secretary of State, Secretary of the Treasury, Secretary of War, Secretary of the Navy, Secretary of the Interior, and Postmaster General. While designations to the office of Attorney General were less frequent, we have identified at least one period in 1866 when a non-Senate-confirmed Assistant Attorney General served as Acting Attorney General. Mr. Whitaker's designation is no more constitutionally problematic than countless similar presidential orders dating back over 200 years.

Were the long agreement of Congress and the President insufficient, judicial precedent confirms the meaning of the Appointments Clause in these circumstances. When Presidents appointed acting Secretaries in the nineteenth century, those officers (or their estates) sometimes sought payment for their additional duties, and courts recognized the lawfulness of such appointments. The Supreme Court confirmed the legal understanding of the Appointments Clause that had prevailed for over a century in *United States v. Eaton*, 169 U.S. 331 (1898), holding that an inferior officer may perform the duties of a principal officer "for a limited time[] and under special and temporary conditions" without "transform[ing]" his office into one for which Senate confirmation is required. *Id.* at 343. The Supreme Court has never departed from *Eaton*'s holding and has repeatedly relied upon that decision in its recent Appointments Clause cases.

In the Vacancies Reform Act, Congress renewed the President's authority to designate non-Senate-confirmed senior officials to perform the functions and duties of principal offices. In 2003, we reviewed the President's authority in connection with the Director of the Officer of Management and Budget ("OMB"), who is a principal officer, and concluded

that the President could designate a non-Senate-confirmed official to serve temporarily as Acting Director. *See Designation of Acting Director of the Office of Management and Budget*, 27 Op. O.L.C. 121 (2003) ("*Acting Director of OMB*"). Presidents George W. Bush and Barack Obama placed non-Senate-confirmed officials in several lines of agency succession and actually designated unconfirmed officials as acting agency heads. President Trump, too, has previously exercised that authority in other departments; Mr. Whitaker is not the first unconfirmed official to act as the head of an agency in this administration.

It is no doubt true that Presidents often choose acting principal officers from among Senate-confirmed officers. But the Constitution does not mandate that choice. Consistent with our prior opinion and with centuries of historical practice and precedents, we advised that the President's designation of Mr. Whitaker as Acting Attorney General on a temporary basis did not transform his position into a principal office requiring Senate confirmation.

## I.

Mr. Whitaker's designation as Acting Attorney General comports with the terms of the Vacancies Reform Act. That Act provides three mechanisms by which an acting officer may take on the functions and duties of an office, when an executive officer who is required to be appointed by the President with the advice and consent of the Senate "dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a). First, absent any other designation, the "first assistant" to the vacant office shall perform its functions and duties. *Id*. § 3345(a)(1). Second, the President may depart from that default course by directing another presidential appointee, who is already Senate confirmed, to perform the functions and duties of the vacant office. *Id*. § 3345(a)(2). Or, third, the President may designate an officer or employee within the same agency to perform the functions and duties of the vacant office, provided that he or she has been in the agency for at least 90 days in the 365 days preceding the vacancy, in a position for which the rate of pay is equal to or greater than the minimum rate for GS-15 of the General Schedule. *Id*. § 3345(a)(3). Except in the case of a vacancy caused by sickness, the statute imposes time limits on the period during which someone may act. *Id*. § 3346. And the acting officer may not be nominated by the President to fill the vacant office and continue acting in

it, unless he was already the first assistant to the office for at least 90 days in the 365 days preceding the vacancy or is a Senate-confirmed first assistant. *Id.* § 3345(b)(1)–(2); *see also Nat'l Labor Relations Bd. v. SW General, Inc.*, 137 S. Ct. 929, 941 (2017).

## A.

The Vacancies Reform Act unquestionably authorizes the President to direct Mr. Whitaker to act as Attorney General after the resignation of Attorney General Sessions on November 7, 2018.[1] Mr. Whitaker did not fall within the first two categories of persons made eligible by section 3345(a). He was not the first assistant to the Attorney General, because 28 U.S.C. § 508(a) identifies the Deputy Attorney General as the "first assistant to the Attorney General" "for the purpose of section 3345." Nor did Mr. Whitaker already hold a Senate-confirmed office. Although Mr. Whitaker was previously appointed, with the advice and consent of the Senate, as the United States Attorney for the Southern District of Iowa, he resigned from that position on November 25, 2009. At the time of the resignation of Attorney General Sessions, Mr. Whitaker was serving in a position to which he was appointed by the Attorney General.

---

[1] Attorney General Sessions submitted his resignation "[a]t [the President's] request," Letter for President Donald J. Trump, from Jefferson B. Sessions III, Attorney General, but that does not alter the fact that the Attorney General "resign[ed]" within the meaning of section 3345(a). Even if Attorney General Sessions had declined to resign and was removed by the President, he still would have been rendered "otherwise unable to perform the functions and duties of the office" for purposes of section 3345(a). As this Office recently explained, "an officer is 'unable to perform the functions and duties of the office' during both short periods of unavailability, such as a period of sickness, and potentially longer ones, such as one resulting from the officer's removal (which would arguably not be covered by the reference to 'resign[ation].')." *Designating an Acting Director of the Bureau of Consumer Financial Protection*, 41 Op. O.L.C. __, at *4 (2017); *see also Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 61 (1999) ("In floor debate, Senators said, by way of example, that an officer would be 'otherwise unable to perform the functions and duties of the office' if he or she were fired, imprisoned, or sick."). Indeed, any other interpretation would leave a troubling gap in the ability to name acting officers. For most Senate-confirmed offices, the Vacancies Reform Act is "the exclusive means" for naming an acting officer. 5 U.S.C. § 3347(a). If the statute did not apply in cases of removal, then it would mean that no acting officer—not even the first assistant—could take the place of a removed officer, even where the President had been urgently required to remove the officer, for instance, by concerns over national security, corruption, or other workplace misconduct.

In that position, Mr. Whitaker fell squarely within the third category of officials, identified in section 3345(a)(3). As Chief of Staff and Senior Counselor, he had served in the Department of Justice for more than 90 days in the year before the resignation, at a GS-15 level or higher. And Mr. Whitaker has not been nominated to be Attorney General, an action that would render him ineligible to serve as Acting Attorney General under section 3345(b)(1). Accordingly, under the plain terms of the Vacancies Reform Act, the President could designate Mr. Whitaker to serve temporarily as Acting Attorney General subject to the time limitations of section 3346.

## B.

The Vacancies Reform Act remains available to the President even though 28 U.S.C. § 508 separately authorizes the Deputy Attorney General and certain other officials to act as Attorney General in the case of a vacancy.[2] We previously considered whether this statute limits the President's authority under the Vacancies Reform Act to designate someone else to be Acting Attorney General. *2007 Acting Attorney General*, 31 Op. O.L.C. 208. We have also addressed similar questions with respect to other agencies' succession statutes. *See Designating an Acting Director of the Bureau of Consumer Financial Protection*, 41 Op. O.L.C. __ (2017) ("*Acting Director of CFPB*"); *Acting Director of OMB*, 27 Op. O.L.C. at 121 n.1. In those instances, we concluded that the Vacancies Reform Act is not the "exclusive means" for the temporary designation of an acting official, but that it remains available as an option to the President. We reach the same conclusion here: Section 508 does not limit the President's authority to invoke the Vacancies Reform Act to designate an Acting Attorney General.

We previously concluded that section 508 does not prevent the President from relying upon the Vacancies Reform Act to determine who will be the Acting Attorney General. Although the Vacancies Reform Act,

---

[2] Under 28 U.S.C. § 508(a), in the case of a vacancy in the office of Attorney General, "the Deputy Attorney General may exercise all the duties of that office, and for the purpose of [the Vacancies Reform Act] the Deputy Attorney General is the first assistant to the Attorney General." If the offices of Attorney General and Deputy Attorney General are both vacant, "the Associate Attorney General shall act as Attorney General," and "[t]he Attorney General may designate the Solicitor General and the Assistant Attorneys General, in further order of succession, to act as Attorney General." *Id*. § 508(b).

which "ordinarily is the exclusive means for naming an acting officer," *2007 Acting Attorney General*, 31 Op. O.L.C. at 209 (citing 5 U.S.C. § 3347), makes an exception for, and leaves in effect, statutes such as section 508, "[t]he Vacancies Reform Act nowhere says that, if another statute remains in effect, the Vacancies Reform Act may not be used." *Id*. In fact, the structure of the Vacancies Reform Act makes clear that office-specific provisions are treated as exceptions from its generally exclusive applicability, not as provisions that supersede the Vacancies Reform Act altogether.[3] Furthermore, as we noted, "the Senate Committee Report accompanying the Act expressly disavows" the view that, where another statute is available, the Vacancies Reform Act may not be used. *Id*. (citing S. Rep. No. 105-250, at 17 (1998)). That report stated that, "'with respect to the specific positions in which temporary officers may serve under the specific statutes this bill retains, the Vacancies [Reform] Act would continue to provide an alternative procedure for temporarily occupying the office.'" *Id*. We therefore concluded that the President could direct the Assistant Attorney General for the Civil Division to act as Attorney General under the Vacancies Reform Act, even though the incumbent Solicitor General would otherwise have served under the chain of succession specified in section 508 (as supplemented by an Attorney General order).

At the time of our *2007 Acting Attorney General* opinion, the first two offices specified in section 508(a) and (b)—Deputy Attorney General and Associate Attorney General—were both vacant. *See* 31 Op. O.L.C. at 208. That is not currently the case; there is an incumbent Deputy Attorney General. But the availability of the Deputy Attorney General does not affect the President's authority to invoke section 3345(a)(3). Nothing in section 508 suggests that the Vacancies Reform Act does not apply when the Deputy Attorney General can serve. To the contrary, the statute expressly states that the Deputy Attorney General is the "first assistant to the Attorney General" "for the purpose of section 3345 of title 5" (i.e., the provision of the Vacancies Reform Act providing for the designation of an acting officer). 28 U.S.C. § 508(a). It further provides that the Deputy

---

[3] One section (entitled "Exclusion of certain offices") is used to exclude certain offices altogether. 5 U.S.C. § 3349c. Office-specific statutes, however, are mentioned in a different section (entitled "Exclusivity") that generally makes the Vacancies Reform Act "the exclusive means" for naming an acting officer but also specifies exceptions to that exclusivity. *Id*. § 3347(a)(1).

Attorney General "may" serve as Acting Attorney General, not that he "must," underscoring that the Vacancies Reform Act remains an alternative means of appointment.[4] These statutory cross-references confirm that section 508 works in conjunction with, and does not displace, the Vacancies Reform Act.

Although the Deputy Attorney General is the default choice for Acting Attorney General under section 3345(a)(1), the President retains the authority to invoke the other categories of eligible officials, "notwithstanding [the first-assistant provision in] paragraph (1)." 5 U.S.C. § 3345(a)(2), (3). Moreover, there is reason to believe that Congress, in enacting the Vacancies Reform Act, deliberately chose to make the second and third categories of officials in section 3345(a) applicable to the office of Attorney General. Under the previous Vacancies Act, the first assistant to an office was also the default choice for filling a vacant Senate-confirmed position, and the President was generally able to depart from that by selecting another Senate-confirmed officer. *See* 5 U.S.C. § 3347 (1994). That additional presidential authority, however, was expressly made inapplicable "to a vacancy in the office of Attorney General." *Id.*; *see also* Rev. Stat. § 179 (2d ed. 1878), 18 Stat. pt. 1, at 28 (repl. vol.). Yet, when Congress enacted the Vacancies Reform Act in 1998, it did away with the exclusion for the office of Attorney General. *See* 5 U.S.C. § 3349c (excluding certain other officers).[5]

Our conclusion that the Vacancies Reform Act remains available, notwithstanding section 508, is consistent with our prior opinions. In *Acting Director of OMB*, we recognized that an OMB-specific statute, 31 U.S.C.

---

[4] We do not mean to suggest that a different result would follow if section 508 said "shall" instead of "may," since as discussed at length in *Acting Director of CFPB*, such mandatory phrasing in a separate statute does not itself oust the Vacancies Reform Act. *See* 41 Op. O.L.C. __, at *7–9 & n.3. The point is that, in contrast with the potential ambiguity arising from the appearance of "shall" in the CFPB-specific statute, section 508 expressly acknowledges that the Deputy Attorney General is the first assistant but will not necessarily serve in the case of a vacancy in the office of Attorney General.

[5] When it reported the Vacancies Reform Act, the Senate Committee on Governmental Affairs contemplated that the Attorney General would continue to be excluded by language in a proposed section 3345(c) that would continue to make section 508 "applicable" to the office. *See* S. Rep. No. 105-250, at 13, 25; 144 Cong. Rec. 12,433 (June 16, 1998). But that provision "was not enacted as part of the final bill, and no provision of the Vacancies Reform Act bars the President from designating an Acting Attorney General under that statute." *2007 Acting Attorney General*, 31 Op. O.L.C. at 209 n.1.

§ 502(f), did not displace the President's authority under the Vacancies Reform Act. *See* 27 Op. O.L.C. at 121 n.1 ("The Vacancies Reform Act does not provide, however, that where there is another statute providing for a presidential designation, the Vacancies Reform Act becomes unavailable."). More recently, we confirmed that the President could designate an Acting Director of the Bureau of Consumer Financial Protection ("CFPB"), notwithstanding 12 U.S.C. § 5491(b)(5), which provides that the Deputy Director of the CFPB "shall" serve as Acting Director when the Director is unavailable. *See Acting Director of CFPB*, 41 Op. O.L.C. __. We reasoned that the CFPB-specific statute should "interact with the Vacancies Reform Act in the same way as other, similar statutes providing an office-specific mechanism for an individual to act in a vacant position." *Id*. at *7–9 & n.3. We noted that the Vacancies Reform Act itself provides that a first assistant to a vacant office "shall perform the functions and duties" of that office unless the President designates someone else to do so, 5 U.S.C. § 3345(a), and that mandatory language in either the CFPB-specific statute or the Vacancies Reform Act does not foreclose the availability of the other statute. *Acting Director of CFPB*, 41 Op. O.L.C. __, at *7–8.

Courts have similarly concluded that the Vacancies Reform Act remains available as an alternative to office-specific statutes. *See Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 555–56 (9th Cir. 2016) (General Counsel of the National Labor Relations Board, which has its own office-specific statute prescribing a method of filling a vacancy); *English v. Trump*, 279 F. Supp. 3d 307, 323–24 (D.D.C. 2018) (holding that the mandatory language in the CFPB-specific statute is implicitly qualified by the Vacancies Reform Act's language providing that the President also "may direct" qualifying individuals to serve in an acting capacity), *appeal dismissed upon appellant's motion*, No. 18-5007, 2018 WL 3526296 (D.C. Cir. July 13, 2018).

For these reasons, we believe that the President could invoke the Vacancies Reform Act in order to designate Mr. Whitaker as Acting Attorney General ahead of the alternative line of succession provided under section 508.

## II.

While the Vacancies Reform Act expressly authorizes the President to select an unconfirmed official as Acting Attorney General, Congress may

not authorize an appointment mechanism that would conflict with the Constitution. *See Freytag v. Comm'r*, 501 U.S. 868, 883 (1991). The Appointments Clause requires the President to "appoint" principal officers, such as the Attorney General, "by and with the Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2. But for "inferior Officers," Congress may vest the appointment power "in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

The President's designation of Mr. Whitaker as Acting Attorney General is consistent with the Appointments Clause so long as Acting Attorney General is not a principal office that requires Senate confirmation. If so, it does not matter whether an acting official temporarily filling a vacant principal office is an inferior officer or not an "officer" at all within the meaning of the Constitution, because Mr. Whitaker was appointed in a manner that satisfies the requirements for an inferior officer: He was appointed by Attorney General Sessions, who was the Head of the Department, and the President designated him to perform additional duties. *See Acting Director of OMB*, 27 Op. O.L.C. at 124–25. If the designation constituted an appointment to a principal office, however, then section 3345(a)(3) would be unconstitutional as applied, because Mr. Whitaker does not currently occupy a position requiring Senate confirmation.

For the reasons stated below, based on long-standing historical practice and precedents, we do not believe that the Appointments Clause may be construed to require the Senate's advice and consent before Mr. Whitaker may be Acting Attorney General.

## A.

The Attorney General is plainly a principal officer, who must be appointed with the advice and consent of the Senate. *See Edmond v. United States*, 520 U.S. 651, 662–63 (1997); *Morrison v. Olson*, 487 U.S. 654, 670–72 (1988). The Attorney General has broad and continuing authority over the federal government's law-enforcement, litigation, and other legal functions. *See, e.g.*, 28 U.S.C. §§ 516, 533. The Supreme Court has not "set forth an exclusive criterion for distinguishing between" inferior officers and principal officers. *Edmond*, 520 U.S. at 661. "Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President." *Id.* at 662. There is no officer below the President who supervises the Attorney General.

Although the Attorney General is a principal officer, it does not follow that an Acting Attorney General should be understood to be one. An office under the Appointments Clause requires both a "continuing and permanent" position and the exercise of "significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (internal quotation marks omitted); *see also Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 74 (2007). While a person acting as the Attorney General surely exercises sufficient authority to be an "Officer of the United States," it is less clear whether Acting Attorney General is a principal office.

Because that question involves the division of powers between the Executive and the Legislative Branches, "historical practice" is entitled to "significant weight." *Nat'l Labor Relations Bd. v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014); *see also, e.g.*, *The Pocket Veto Case*, 279 U.S. 655, 689 (1929). That practice strongly supports the constitutionality of authorizing someone who has not been Senate-confirmed to serve as an acting principal officer. Since 1792, Congress has repeatedly legislated on the assumption that temporary service as a principal officer does not require Senate confirmation. As for the Executive Branch's practice, our non-exhaustive survey has identified over 160 occasions between 1809 and 1860 on which non-Senate-confirmed persons served temporarily as an acting or ad interim principal officer in the Cabinet.

Furthermore, judicial precedents culminating in *United States v. Eaton*, 169 U.S. 331 (1898), endorsed that historical practice and confirm that the temporary nature of acting service weighs against principal-officer status. The Supreme Court in *Eaton* held that an inferior officer may perform the duties of a principal officer "for a limited time[] and under special and temporary conditions" without "transform[ing]" his office into one for which Senate confirmation is required. *Id.* at 343. That holding was not limited to the circumstances of that case, but instead reflected a broad consensus about the status of an acting principal officer that the Supreme Court has continued to rely on in later Appointments Clause decisions.

### 1.

Since the Washington Administration, Congress has "authoriz[ed] the President to direct certain officials to temporarily carry out the duties of a vacant PAS office [i.e., one requiring Presidential Appointment and Senate confirmation] in an acting capacity, without Senate confirmation."

*SW General*, 137 S. Ct. at 934; *see also Noel Canning*, 134 S. Ct. at 2609 (Scalia, J., dissenting in relevant part) (observing that the President does not need to use recess appointments to fill vacant offices because "Congress can authorize 'acting' officers to perform the duties associated with a temporarily vacant office—and has done that, in one form or another, since 1792"). Those statutes, and evidence of practice under them during the early nineteenth century, did not limit the pool of officials eligible to serve as an acting principal officer to those who already have Senate-confirmed offices. This history provides compelling support for the conclusion that the position of an *acting* principal officer is not itself a principal office.

In 1792, Congress first "authorized the appointment of 'any person or persons' to fill specific vacancies in the Departments of State, Treasury, and War." *SW General*, 137 S. Ct. at 935 (quoting Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281). Although the statute expressly mentioned vacancies in the position of Secretary in each of those Departments, the President was authorized to choose persons who held no federal office at all—much less one requiring Senate confirmation. Although the 1792 statute "allowed acting officers to serve until the permanent officeholder could resume his duties or a successor was appointed," Congress "imposed a six-month limit on acting service" in 1795. *Id*. at 935 (citing Act of Feb. 13, 1795, ch. 21, 1 Stat. 415). In 1863, in response to a plea from President Lincoln, *see* Message to Congress (Jan. 2, 1863), Cong. Globe, 37th Cong., 3d Sess. 185 (1863), Congress extended the provision to permit the President to handle a vacancy in the office of "the head of any Executive Department of the Government, or of any officer of either of the said Departments whose appointment is not in the head thereof." Act of Feb. 20, 1863, ch. 45, § 1, 12 Stat. 656, 656. The 1863 statute allowed the duties of a vacant office to be performed for up to six months by "the head of any other Executive Department" or by any other officer in those departments "whose appointment is vested in the President." *Id*.

In 1868, Congress replaced all previous statutes on the subject of vacancies with the Vacancies Act of 1868. *See* Act of July 23, 1868, ch. 227, 15 Stat. 168. That act provided that, "in case of the death, resignation, absence, or sickness of the head of any executive department of the government, the first or sole assistant thereof shall . . . perform the duties of such head until a successor be appointed or the absence or sickness shall cease." *Id*. § 1, 15 Stat. at 168. In lieu of elevating the "first or sole assistant," the President could also choose to authorize any other officer

11

appointed with the Senate's advice and consent to perform the duties of the vacant office until a successor was appointed or the prior occupant of the position was able to return to his post. *Id*. § 3, 15 Stat. at 168. In cases of death or resignation, an acting official could serve for no longer than ten days. *Id*. The 1868 act thus eliminated the President's prior discretion to fill a vacant office temporarily with someone who did not hold a Senate-confirmed position. Yet, it preserved the possibility that a non-Senate-confirmed first assistant would serve as an acting head of an executive department.

Over the next 120 years, Congress repeatedly amended the Vacancies Act of 1868, but it never eliminated the possibility that a non-Senate-confirmed first assistant could serve as an acting head of an executive department. In 1891, it extended the time limit for acting service in cases of death or resignation from ten to thirty days. Act of Feb. 6, 1891, ch. 113, 26 Stat. 733. In 1966, it made minor changes during the course of re-codifying and enacting title 5 of the United States Code. *See* S. Rep. No. 89-1380, at 20, 70–71 (1966); 5 U.S.C. §§ 3345–3349 (1970). Congress amended the act once more in 1988, extending the time limit on acting service from 30 to 120 days and making the statute applicable to offices that are not in "Departments" and thus are less likely to have Senate-confirmed first assistants. Pub. L. No. 100-398, § 7(b), 102 Stat. 985, 988 (1988).

Accordingly, for more than two centuries before the Vacancies Reform Act, Congress demonstrated its belief that the Appointments Clause did not require Senate confirmation for temporary service in a principal office, by repeatedly enacting statutes that affirmatively authorized acting service—even in principal offices at the heads of executive departments—by persons who did not already hold an appointment made with the Senate's advice and consent.

## 2.

Not only did Congress authorize the Presidents to select officials to serve temporarily as acting principal officers, but Presidents repeatedly exercised that power to fill temporarily the vacancies in their administrations that arose from resignations, terminations, illnesses, or absences from the seat of government. In providing this advice, we have not can-vassed the entire historical record. But we have done enough to confirm that Presidents often exercised their powers under the 1792 and 1795

statutes to choose persons who did not hold any Senate-confirmed position to act temporarily as principal officers in various departments. In the Washington, Adams, and Jefferson Administrations, other Cabinet officers (or Chief Justice John Marshall) were used as temporary or "ad interim" officials when offices were vacant between the departure of one official and the appointment of his successor. *See, e.g.*, *Biographical Directory of the American Congress, 1774–1971*, at 13–14 (1971); *see id.* at 12 (explaining that the list of Cabinet officers excludes "[s]ubordinates acting temporarily as heads of departments" and therefore lists only those who served ad interim after an incumbent's departure).

President Jefferson made the first designation we have identified of a non-Senate-confirmed officer to serve temporarily in his Cabinet. On February 17, 1809, approximately two weeks before the end of the Jefferson Administration, John Smith, the chief clerk of the Department of War, was designated to serve as Acting Secretary of War. *See id.* at 14; Letter from Thomas Jefferson to the War Department (Feb. 17, 1809), National Archives, *Founders Online*, https://founders.archives.gov/documents/Jefferson/99-01-02-9824 ("Whereas, by the resignation of Henry Dearborne, late Secretary at War, that office is become vacant. I therefore do hereby authorize John Smith, chief clerk of the office of the Department of War, to perform the duties of the said office, until a successor be appointed."). As chief clerk, Smith was not a principal officer. He was instead "an inferior officer . . . appointed by the [Department's] principal officer." Act of Aug. 5, 1789, ch. 6, § 2, 1 Stat. 49, 50. The next Secretary of War did not enter upon duty until April 8, 1809, five weeks after the beginning of the Madison Administration. *See Biographical Directory* at 14.

Between 1809 and 1860, President Jefferson's successors designated a non-Senate-confirmed officer to serve as an acting principal officer in a Cabinet position on at least 160 other occasions. We have identified 106 additional instances during that period where chief clerks, who were not Senate confirmed, temporarily served as ad interim Secretary of State (on 48 occasions), Secretary of the Treasury (on 33 occasions), or Secretary of War (on 25 occasions). *See id.* at 15–19; 1 *Trial of Andrew Johnson, President of the United States, Before the Senate of the United States, on Impeachment by the House of Representatives for High Crimes and Misdemeanors* 575–81, 585–88, 590–91 (Washington, GPO 1868); *In re Asbury Dickins*, Rep. C.C. 9, 34th Cong., 1st Sess. at 4–5 (Ct. Cl. 1856) (listing 18 times between 1829 and 1836 that chief clerk Asbury Dickins

was "appointed to perform the duties of Secretary of the Treasury" or Secretary of State "during the absence from the seat of government or sickness" of those Secretaries, for a total of 359 days).[6] Between 1851 and 1855 there were also at least 21 occasions on which non-Senate-confirmed Assistant Secretaries were authorized to act as Secretary of the Treasury.[7]

We have also identified instances involving designations of persons who apparently had no prior position in the federal government, including Alexander Hamilton's son, James A. Hamilton, whom President Jackson directed on his first day in office to "take charge of the Department of State until Governor [Martin] Van Buren should arrive in the city" three weeks later. 1 *Trial of Andrew Johnson* at 575; *see Biographical Directo-*

---

[6] *See also* Act of July 27, 1789, ch. 4, § 2, 1 Stat. 28, 29 (providing that the chief clerk in what became the Department of State was "an inferior officer, to be appointed by the [Department's] principal officer"); Act of Sept. 2, 1789, ch. 12, § 1, 1 Stat. 65, 65 (providing for an "Assistant to the Secretary of the Treasury," later known as the chief clerk, who "shall be appointed by the said Secretary"). The sources cited in the text above indicate that (1) the following chief clerks served as ad interim Secretary of State: Aaron Ogden Dayton, Aaron Vail (twice), Asbury Dickins (10 times), Daniel Carroll Brent (5 times), Daniel Fletcher Webster, Jacob L. Martin (3 times), John Appleton, John Graham, Nicholas Philip Trist (4 times), Richard K. Cralle, William S. Derrick (12 times), William Hunter (7 times); (2) the following chief clerks served as ad interim Secretary of the Treasury: Asbury Dickins (8 times), John McGinnis, and McClintock Young (24 times); and (3) the following chief clerks (or acting chief clerks) served as ad interim Secretary of War: Albert Miller Lee, Archibald Campbell (5 times), Carey A. Harris (4 times), Christopher Vandeventer, George Graham, John D. McPherson, John Robb (6 times), Philip G. Randolph (4 times), Samuel J. Anderson, and William K. Drinkard.

Editor's Note: As originally issued, this footnote and accompanying text referred to a total of 109, rather than 106, instances. Some had been inadvertently counted twice and Carey A. Harris had been omitted because the *Biographical Directory* identifies him as the Commissioner of Indian Affairs though he did not assume that position until later. The total number of known instances between 1809 and 1860 remains more than 160 because, after the opinion was issued, we confirmed three additional examples in which persons without any Senate-confirmed position served as an ad interim Secretary: William S. Derrick was ad interim Secretary of State while serving as Clerk for the Diplomatic Bureau; Samuel H. Porter was ad interim Secretary of War while serving as Agent for the Office of the Commissioner of Indian Affairs; and Mahlon Dickerson was ad interim Secretary of War before becoming the Secretary of the Navy. *See* 1 *Trial of Andrew Johnson* at 577, 578, 579.

[7] *See* 1 *Trial of Andrew Johnson* at 580–81, 590–91 (entries for William L. Hodge and Peter Washington); Act of Mar. 3, 1849, ch. 108, § 13, 9 Stat. 395, 396–97 (providing for appointment by the Secretary of an "Assistant Secretary of the Treasury").

*ry* at 16. President Jackson also twice named William B. Lewis, who held no other government position, as acting Secretary of War. *See* 1 *Trial of Andrew Johnson* at 575. Moving beyond the offices expressly covered by the 1792 and 1795 statutes, there were at least 23 additional instances before 1861 in which Presidents authorized a non-Senate-confirmed chief clerk to perform temporarily the duties of the Secretary of the Navy (on 21 occasions) or the Secretary of the Interior (on 2 occasions).[8]

At the time, it was well understood that when an Acting or ad interim Secretary already held an office such as chief clerk, he was not simply performing additional duties, but he was deemed the Acting Secretary. We know this, because the chief clerks sometimes sought payment for the performance of those additional duties. Attorney General Legaré concluded that Chief Clerk McClintock Young had a claim for compensation as "Secretary of the Treasury *ad interim*." *Pay of Secretary of the Treasury ad Interim*, 4 Op. Att'y Gen. 122, 122–23 (1842). And the Court of Claims later concluded that Congress should appropriate funds to compensate such officers for that service. *See, e.g.*, *In re Cornelius Boyle*, Rep. C.C. 44, 34th Cong., 3d Sess. at 9, 1857 WL 4155, at *4 (Ct. Cl. 1857) ("The office of Secretary *ad interim* being a distinct and independent office in itself, when it is conferred on the chief clerk, it is so conferred not because it pertains to him *ex officio*, but because the President, in the exercise of his discretion, sees fit to appoint him[.]"); *Dickins*, Rep. C.C. 9, at 16, 1856 WL 4042, at *3.

Congress not only acquiesced in such appointments, but also required a non-Senate-confirmed officer to serve as a principal officer in some instances. In 1810, Congress provided that in the case of a vacancy in the office of the Postmaster General, "all his duties shall be performed by his senior assistant." Act of Apr. 30, 1810, ch. 37, § 1, 2 Stat. 592, 593. The senior assistant was one of two assistants appointed by the Postmaster General. *Id*. When Congress reorganized the Post Office in 1836, it again required that the powers and duties of the Postmaster General would, in the case of "death, resignation, or absence" "devolve, for the time being on the First Assistant Postmaster General," who was still an appointee of

---

[8] *See Biographical Directory* at 14–17 (chief clerks of the Navy in 1809, 1814–15, 1829, 1831, and 1841); *id*. at 18 (chief clerk of the Department of the Interior, Daniel C. Goddard, in 1850 (twice)); *In re Cornelius Boyle*, Rep. C.C. 44, 34th Cong., 3d Sess. at 3, 12–13 (Ct. Cl. 1857) (identifying 13 times between 1831 and 1838 that chief clerk John Boyle was appointed as Acting Secretary of the Navy, for a total of 466 days).

the Postmaster General. Act of July 2, 1836, ch. 270, § 40, 5 Stat. 80, 89. On four occasions before 1860, a First Assistant Postmaster General served as Postmaster General ad interim. *See Biographical Directory* at 17–19 (in 1841 (twice), 1849, and 1859).

On the eve of the Civil War in January 1861, President Buchanan summarized the Chief Executive's view of his authority to designate interim officers in a message submitted to Congress to explain who had been performing the duties of the Secretary of War:

> The practice of making . . . appointments [under the 1795 statute], whether in a vacation or during the session of Congress, has been constantly followed during every administration from the earliest period of the government, and *its perfect lawfulness has never, to my knowledge, been questioned or denied*. Without going back further than the year 1829, and without taking into the calculation any but the chief officers of the several departments, it will be found that provisional appointments to fill vacancies were made to the number of one hundred and seventy-nine . . . . Some of them were made while the Senate was in session, some which were made in vacation were continued in force long after the Senate assembled. *Sometimes, the temporary officer was the commissioned head of another department, sometimes a subordinate in the same department*.

Message from the President of the United States, S. Exec. Doc. No. 2, 36th Cong., 2d Sess. at 1–2 (Jan. 15, 1861) (emphases added).

### 3.

When it comes to vacancy statutes, the office of Attorney General presents an unusual case, albeit not one suggesting any different constitutional treatment. The office was established in the Judiciary Act of 1789, *see* Act of Sept. 24, 1789, ch. 20, § 35, 1 Stat. 73, 93, and the Attorney General was a member of the President's Cabinet, *see Office and Duties of Attorney General*, 6 Op. Att'y Gen. 326, 330 (1854). But the Attorney General did not supervise an "executive department," and the Department of Justice was not established until 1870. *See* Act of June 22, 1870, ch. 150, § 1, 16 Stat. 162, 162. Thus, the terms of the 1792, 1795, and 1863 statutes, and of the Vacancies Act of 1868, did not expressly apply to vacancies in the office of the Attorney General.

Even so, the President made "temporary appointment[s]" to the office of Attorney General on a number of occasions. In 1854, Attorney General Cushing noted that "proof exists in the files of the department that temporary appointment has been made by the President in that office." *Office and Duties of Attorney General*, 6 Op. Att'y Gen. at 352. Because the 1792 and 1795 statutes did not provide the President with express authority for those temporary appointments, Cushing believed it "questionable" whether the President had the power, but he also suggested that "[p]erhaps the truer view of the question is to consider the two statutes as declaratory only, and to assume that the power to make such temporary appointment is a constitutional one." *Id*. Cushing nonetheless recommended the enactment of "a general provision . . . to remove all doubt on the subject" for the Attorney General and "other non-enumerated departments." *Id*.

Congress did not immediately remedy the problem that Cushing identified, but Presidents designated Acting Attorneys General, both before and after the Cushing opinion. In some instances, the President chose an officer who already held another Senate-confirmed office. *See Acting Attorneys General*, 8 Op. O.L.C. 39, 40–41 (1984) (identifying instances in 1848 and 1868 involving the Secretary of the Navy or the Secretary of the Interior).[9] In other instances, however, non-Senate-confirmed individuals served. After the resignation of Attorney General James Speed, for instance, Assistant Attorney General J. Hubley Ashton was the ad interim Attorney General from July 17 to July 23, 1866. *See id*. at 41; *Biographical Directory* at 20. At the time, the Assistant Attorney General was appointed by the Attorney General alone. *See* Act of March 3, 1859, ch. 80, 11 Stat. 410, 420 ("[T]he Attorney-General . . . is hereby[] authorized to appoint one assistant in the said office, learned in the law, at an annual salary of three thousand dollars[.]").[10]

---

[9] This list is almost certainly under-inclusive because the published sources we have located identify only those who were Acting Attorney General during a period between the resignation of one Attorney General and the appointment of his successor. They do not identify individuals who may have performed the functions and duties of Attorney General when an incumbent Attorney General was temporarily unavailable on account of an absence or sickness that would now trigger either 28 U.S.C. § 508(a) or 5 U.S.C. § 3345(a).

[10] In 1868, Congress created two new Assistant Attorneys General positions to be "appointed by the President, by and with the advice and consent of the Senate," and specified that those positions were "in lieu of," among others, "the assistant attorney-general now provided for by law," which was "abolished" effective on July 1, 1868. Act of June 25,

On other occasions between 1859 and 1868, Ashton and other Assistant Attorneys General who had not been Senate confirmed also signed several formal legal opinions as "Acting Attorney General," presumably when their incumbent Attorney General was absent or otherwise unavailable. *See Case of Colonel Gates*, 11 Op. Att'y Gen. 70, 70 (1864) (noting that the question from the President "reached this office in [the Attorney General's] absence").[11] In 1873, when Congress reconciled the Vacancies Act of 1868 with the Department of Justice's organic statute, it expressly excepted the office of Attorney General from the general provision granting the President power to choose who would temporarily fill a vacant Senate-confirmed office. *See* Rev. Stat. § 179 (1st ed. 1875), 18 Stat. pt. 1, at 27. There is accordingly no Attorney General-specific practice with respect to the pre-1998 statutes.

## B.

Well before the Supreme Court's foundational decision in *Eaton* in 1898, courts approved of the proposition that acting officers are entitled to payment for services during their temporary appointments as principal officers. *See, e.g.*, *United States v. White*, 28 F. Cas. 586, 587 (C.C.D. Md. 1851) (Taney, Circuit J.) ("[I]t often happens that, in unexpected contingencies, and for temporary purposes, the appointment of a person already in office, to execute the duties of another office, is more convenient and useful to the public, than to bring in a new officer to execute the duty."); *Dickins*, Rep. C.C. 9, at 17, 1856 WL 4042, at *3 (finding a chief clerk was entitled to additional compensation "for his services[] as acting

---

1868, ch. 71, § 5, 15 Stat. 75, 75. A few weeks later, Ashton was confirmed by the Senate as an Assistant Attorney General. *See* S. Exec. J., 40th Cong. 2d Sess. 369 (July 25, 1868). He was therefore holding a Senate-confirmed office when he served another stint as Acting Attorney General for several days at the beginning of the Grant Administration in March 1869, *see Biographical Directory* at 21, and when he signed five opinions as "Acting Attorney General" in September and October 1868.

[11] There were two additional opinions signed by Ashton as "Acting Attorney General" in 1864 and 1865 (11 Op. Att'y Gen. 482; 11 Op. Att'y Gen. 127); as well as four signed as "Acting Attorney General" by Assistant Attorney General John Binckley in 1867 (12 Op. Att'y Gen. 231; 12 Op. Att'y Gen. 229; 12 Op. Att'y Gen 222; 12 Op. Att'y Gen. 227); two signed as "Acting Attorney General" by Assistant Attorney General Titian J. Coffey in 1862 and 1863 (10 Op. Att'y Gen. 492; 10 Op. Att'y Gen. 377); and one signed as "Acting Attorney General" by Assistant Attorney General Alfred B. McCalmont in 1859 (9 Op. Att'y Gen. 389).

Secretary of the Treasury and as acting Secretary of State"). Most significantly, in *Boyle*, the Court of Claims concluded that the chief clerk of the Navy (who was not Senate confirmed) had properly served as Acting Secretary of the Navy on an intermittent basis over seven years for a total of 466 days. Rep. C.C. 44, at 8, 1857 WL 4155, at *1–2 (1857). The court expressly addressed the Appointments Clause question and distinguished, for constitutional purposes, between the office of Secretary of the Navy and the office of Acting Secretary of the Navy. *Id*. at 8, 1857 WL 4155 at *3 ("It seems to us . . . plain that the office of Secretary *ad interim* is a distinct and independent office in itself. It is not the office of Secretary[.]"). Furthermore, the court emphasized, the defining feature of the office of Secretary ad interim was its "temporary" character, and it must therefore be considered an inferior office:

> Congress has exercised the power of vesting the appointment of a Secretary *ad interim* in the President alone, and we think, in perfect consistency with the Constitution of the United States. We do not think that there can be any doubt that he is an *inferior* officer, in the sense of the Constitution, whose appointment may be vested by Congress in the President alone.

*Id*.

When the Supreme Court addressed this Appointments Clause issue in 1898, it reached a similar conclusion. In *United States v. Eaton*, the Court considered whether Congress could authorize the President alone to appoint a subordinate officer "charged with the duty of temporarily performing the functions" of a principal officer. 169 U.S. at 343. The statute authorized the President "to provide for the appointment of vice-consuls . . . in such manner and under such regulations as he shall deem proper." *Id*. at 336 (quoting Rev. Stat. § 1695 (2d ed. 1878), 18 Stat. pt. 1, at 303 (repl. vol.)). The President's regulation provided that "[i]n case a vacancy occurs in the offices both of the consul and the vice-consul, which requires the appointment of a person to perform temporarily the duties of the consulate, the diplomatic representative has authority to make such appointment, with the consent of the foreign government . . . immediate notice being given to the Department of State." *Id*. at 338 (quoting regulation). Pursuant to that authority, Sempronius Boyd, who was the diplomatic representative and consul-general to Siam, appointed Lewis Eaton (then a missionary who was not employed by the government) as a vice-consul-general and directed him to take charge of the consulate after

Boyd's departure. *Id*. at 331–32. With the "knowledge" and "approval" of the Department of State, Eaton remained in charge of the consulate, at times calling himself "acting consul-general of the United States at Bangkok," from July 12, 1892, until a successor vice-consul-general arrived on May 18, 1893. *Id*. at 332–33. In a dispute between Boyd's widow and Eaton over salary payments, the Court upheld Eaton's appointment, and the underlying statutory scheme, against an Appointments Clause challenge. *Id*. at 334–35, 352.

The Constitution expressly includes "Consuls" in the category of officers whose appointment requires the Senate's advice and consent. U.S. Const. art. II, § 2, cl. 2. The *Eaton* Court, however, concluded that a "vice-consul" is an inferior officer whose appointment Congress may "vest in the President" alone. 169 U.S. at 343. The Court held that Eaton's exercise of the authority of a Senate-confirmed office did not transform him into an officer requiring Senate confirmation:

> Because the subordinate officer is charged with the performance of the duty of the superior for a limited time and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered.

*Id*. The Court concluded that more than forty years of practice "sustain the theory that a vice-consul is a mere subordinate official," which defeated the contention that Eaton's appointment required Senate confirmation. *Id*. at 344. In so doing, the Court cited Attorney General Cushing's 1855 opinion about appointments of consular officials, which had articulated the parameters for that practice. *See id*.[12] Significantly, the Court also made clear that its holding was not limited to vice-consuls or to the exigencies of Eaton's particular appointment. Rather, the Court emphasized that the temporary performance of a principal office is not the same as holding that office itself. The Court feared that a contrary holding would

---

[12] In the 1855 opinion, Attorney General Cushing explained that a vice-consul is "the person employed to fill the [consul's] place temporarily in his absence." *Appointment of Consuls*, 7 Op. Att'y Gen. 242, 262 (1855). He noted that consuls had to be Senate-confirmed, but vice-consuls were regarded as the "subordinates of consuls" and therefore did not require "nomination to the Senate." *Id*. at 247.

bear upon "any and every delegation of power to an inferior to perform *under any circumstances or exigency*." *Id.* at 343 (emphasis added). In view of the long history of such appointments, *Eaton* simply confirmed the general rule. It did not work any innovation in that practice.

The Court has not retreated from *Eaton*, or narrowed its holding, but instead has repeatedly cited the decision for the proposition that an inferior officer may temporarily perform the duties of a principal officer without Senate confirmation. In *Edmond*, the Court observed that "'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." 520 U.S. at 663. But the Court also observed that there is no "exclusive criterion for distinguishing between principal and inferior officers" and restated *Eaton*'s holding that "a vice consul charged temporarily with the duties of the consul" is an "inferior" officer. *Id.* at 661. In *Morrison*, the Court emphasized that a subordinate who performed a principal officer's duties "for a limited time and under special and temporary conditions" is not "thereby transformed into the superior and permanent official," and explained that a vice-consul appointed during the consul's "temporary absence" remained a "subordinate officer notwithstanding the Appointment Clause's specific reference to 'Consuls' as principal officers." 487 U.S. at 672–73 (quoting *Eaton*, 169 U.S. at 343). Justice Scalia's dissenting opinion in *Morrison* similarly described *Eaton* as holding that "the appointment by an Executive Branch official other than the President of a 'vice-consul,' charged with the duty of temporarily performing the function of the consul, did not violate the Appointments Clause." *Id.* at 721 (Scalia, J., dissenting). Likewise, in his dissenting opinion in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 537 F.3d 667 (D.C. Cir. 2008), *aff'd in part and rev'd in part*, 561 U.S. 447 (2010), then-Judge Kavanaugh cited *Eaton* to establish that "[t]he temporary nature of the office is the . . . reason that *acting* heads of departments are permitted to exercise authority without Senate confirmation." *Id.* at 708 n.17 (Kavanaugh, J., dissenting). Notably, Judge Kavanaugh also cited our 2003 opinion, which concluded that an OMB official who was not Senate confirmed could serve as Acting Director of OMB. *See id.* (citing *Acting Director of OMB*, 27 Op. O.L.C. at 123).

In *SW General*, the Court acknowledged the long history of Acts of Congress permitting the President to authorize officials to temporarily perform the functions of vacant offices requiring Senate approval. 137

S. Ct. at 935. Although the Court's opinion did not address the Appointments Clause, Justice Thomas's concurring opinion suggested that a presidential directive to serve as an officer under the Vacancies Reform Act should be viewed as an appointment, and that such a direction would "raise[] grave constitutional concerns because the Appointments Clause forbids the President to appoint principal officers without the advice and consent of the Senate." *Id*. at 946. But Justice Thomas also distinguished *Eaton* on the ground that the acting designation at issue in *SW General* was not "special and temporary" because it had remained in place "for more than three years in offices limited by statute to a 4-year term." *Id*. at 946 n.1. Justice Thomas's opinion may therefore be understood to be consistent not only with *Eaton*, but also with the precedents of this Office, which have found it "implicit" that "the tenure of an Acting Director should not continue beyond a reasonable time." *Continuing Service of Deputy Director of OMB as Acting Director During Vacancy*, 1 Op. O.L.C. 287, 289–90 (1977). Even under Justice Thomas's opinion, Mr. Whitaker's designation as Acting Attorney General, which was made one week ago, and which would lapse in the absence of a presidential nomination, should qualify as "special and temporary" under *Eaton*.

## C.

Executive practice and more recent legislation reinforces that an inferior officer may temporarily act in the place of a principal officer. In 1980, for instance, this Office raised no constitutional concerns in concluding (in the context of a non-executive office) that the Comptroller General was statutorily authorized to "designate an employee" of the General Accounting Office to be Acting Comptroller General during the absence or incapacity of both the Senate-confirmed Comptroller General and the Senate-confirmed Deputy Comptroller General. *Authority of the Comptroller General to Appoint an Acting Comptroller General*, 4B Op. O.L.C. 690, 690–91 (1980).

Most significantly, in 2003, this Office relied on *Eaton* in concluding that, although "the position of Director [of OMB] is a principal office, . . . an Acting Director [of OMB] is only an inferior officer." *Acting Director of OMB*, 27 Op. O.L.C. at 123. We did not think that that conclusion had been called into question by *Edmond*'s statement that an inferior officer is one who reports to a superior officer below the President, because in that case "[t]he Court held only that '[g]enerally speaking' an inferior officer

is subordinate to an officer other than the President," and because *Edmond* did not deal with temporary officers. 27 Op. O.L.C. at 124 (citations omitted). Assuming that for constitutional purposes the official designated as acting head of an agency would need to be an inferior officer (and that the OMB official in question was not already such an officer), we further concluded that the President's designation of an acting officer under the Act should be regarded as an appointment by the President alone— a constitutionally permissible mode for appointing an inferior officer. *Id*. at 125. Since then, Presidents George W. Bush and Obama each used their authority under the Vacancies Reform Act to place non-Senate-confirmed Chiefs of Staff in the lines of succession to be the acting head of several federal agencies.[13] In three instances, President Obama placed a Chief of Staff above at least one Senate-confirmed officer within the same department.[14] And, in practice, during the Bush, Obama, and Trump Administrations, multiple unconfirmed officers were designated to serve as acting agency heads, either under the Vacancies Reform Act or another

---

[13] *See* Memorandum, Designation of Officers of the Social Security Administration, 71 Fed. Reg. 20333 (Apr. 17, 2006); Memorandum, Designation of Officers of the Council on Environmental Quality, 73 Fed. Reg. 54487 (Sept. 18, 2008) (later superseded by 2017 memorandum cited below); Memorandum, Designation of Officers of the Overseas Private Investment Corporation to Act as President of the Overseas Private Investment Corporation, 76 Fed. Reg. 33613 (June 6, 2011); Memorandum, Designation of Officers of the Millennium Challenge Corporation to Act as Chief Executive Officer of the Millennium Challenge Corporation, 77 Fed. Reg. 31161 (May 21, 2012); Memorandum, Designation of Officers of the General Services Administration to Act as Administrator of General Services, 78 Fed. Reg. 59161 (Sept. 20, 2013); Memorandum, Designation of Officers of the Office of Personnel Management to Act as Director of the Office of Personnel Management, 81 Fed. Reg. 54715 (Aug. 12, 2016); Memorandum, Providing an Order of Succession Within the National Endowment of the Humanities, 81 Fed. Reg. 54717 (Aug. 12, 2016); Memorandum, Providing an Order of Succession Within the National Endowment of the Arts, 81 Fed. Reg. 96335 (Dec. 23, 2016); Memorandum, Designation of Officers or Employees of the Office of Science and Technology Policy to Act as Director, 82 Fed. Reg. 7625 (Jan. 13, 2017); Memorandum, Providing an Order of Succession Within the Council on Environmental Quality, 82 Fed. Reg. 7627 (Jan. 13, 2017).

[14] *See* Executive Order 13612, Providing an Order of Succession Within the Department of Agriculture, 77 Fed. Reg. 31153 (May 21, 2012); Executive Order 13735, Providing an Order of Succession Within the Department of the Treasury, 81 Fed. Reg. 54709 (Aug. 12, 2016); Executive Order 13736, Providing an Order of Succession Within the Department of Veterans Affairs, 81 Fed. Reg. 54711 (Aug. 12, 2016).

office-specific statute.[15] Those determinations reflect the judgments of these administrations that the President may lawfully designate an unconfirmed official, including a Chief of Staff, to serve as an acting principal officer.

Congress too has determined in the Vacancies Reform Act and many other currently operative statutes that non-Senate-confirmed officials may temporarily perform the functions of principal officers. By its terms, the Vacancies Reform Act applies to nearly all executive offices for which appointment "is required to be made by the President, by and with the advice and consent of the Senate." 5 U.S.C. § 3345(a); *see id*. § 3349c(1)–(3) (excluding only certain members of multi-member boards, commissions, or similar entities). And it specifically provides for different treatment in some respects depending on whether the vacant office is that of an agency head. *Id*. § 3348(b)(2). Moreover, the statute contemplates that non-Senate-confirmed officials will be able to serve as acting officers in certain applications of section 3345(a)(1) as well as in all applications of section 3345(a)(3), which refers to an "officer or employee." The latter provision had no counterpart in the Vacancies Act of 1868, but it was not completely novel, because clerks, who were not Senate-confirmed, were

---

[15] For example, during this administration, Grace Bochenek, a non-Senate-confirmed laboratory director, served as Acting Secretary of Energy from January 20, 2017, until March 2, 2017; Tim Horne, a non-Senate-confirmed Regional Commissioner, served as Acting Administrator of the General Services Administration from January 20, 2017, until December 12, 2017 (pursuant to a designation under a GSA-specific statute); Phil Rosenfelt, a non-Senate-confirmed Deputy General Counsel, served as Acting Secretary of Education from January 20, 2017, until February 7, 2017 (pursuant to a designation under a statute specific to that department); Don Wright, a non-Senate-confirmed Deputy Assistant Secretary, served as Acting Secretary of Health and Human Services from September 30, 2017, until October 10, 2017; Peter O'Rourke, a non-Senate-confirmed Chief of Staff, served as Acting Secretary of Veterans Affairs from May 29, 2018, until July 30, 2018; and Shelia Crowley, a non-Senate-confirmed Chief of Operations, served, upon President's Obama's designation, as Acting Director of the Peace Corps from January 20, 2017, until November 16, 2017. During the Obama administration, Darryl Hairston, a career employee, served as Acting Administrator of the Small Business Administration from January 22, 2009, until April 6, 2009, and Edward Hugler, a non-Senate-confirmed Deputy Assistant Secretary, served as Acting Secretary of Labor from February 2, 2009, until February 24, 2009. During the Bush Administration, Augustine Smythe, a non-Senate-confirmed Executive Associate Director served as Acting Director of OMB from June 10, 2003, until late June 2003, consistent with our opinion.

routinely authorized to serve as acting officers under the 1792 and 1795 statutes.[16]

Congress has also enacted various statutes that enable deputies not confirmed by the Senate to act when the office of the Senate-confirmed agency head is vacant. *See* 12 U.S.C. § 4512(f) (providing for an Acting Director of the Federal Housing Finance Agency); *id.* § 5491(b)(5) (providing for an Acting Director of the Bureau of Consumer Financial Protection); 21 U.S.C. § 1703(a)(3) (providing for an Acting Director of the Office of National Drug Control Policy); 40 U.S.C. § 302(b) (providing for an Acting Administrator of the General Services Administration); 44 U.S.C. § 2103(c) (providing for an Acting Archivist). All of those provisions contemplate the temporary service of non-Senate-confirmed officials as acting principal officers, and these statutes would appear to be unconstitutional if only a Senate-confirmed officer could temporarily serve as an acting principal officer.

Similarly, other current statutes provide that, although the deputy is appointed by the President with the Senate's advice and consent, the President or the department head may designate another official to act as the agency head, even though that official is not Senate-confirmed. *See* 20 U.S.C. § 3412(a)(1) (providing that "[t]he Secretary [of Education] shall designate the order in which other officials of the Department shall act for and perform the functions of the Secretary . . . in the event of vacancies in both" the Secretary and Deputy Secretary positions); 31 U.S.C. § 502(f) (providing that the President may designate "an officer of the Office [of Management and Budget] to act as Director"); 38 U.S.C. § 304 (providing that the Deputy Secretary of Veterans Affairs serves as Acting Secretary "[u]nless the President designates another officer of the Government"); 42 U.S.C. § 7132(a) (providing that "[t]he Secretary [of Energy] shall designate the order in which the Under Secretary and other officials shall act for and perform the functions of the Secretary . . . in the event of vacancies in both" the Secretary and Deputy Secretary positions); 49 U.S.C. § 102(e) (providing that the Secretary of Transportation shall

---

[16] Echoing the movement in the early nineteenth century to chief clerks rather than Senate-confirmed officials from other departments, section 3345(a)(3) was reportedly the product of a desire to give the President "more flexibility" to use "qualified individuals who have worked within the agency in which the vacancy occurs for a minimum number of days and who are of a minimum grade level." S. Rep. No. 105-250, at 31 (additional views of Sen. Glenn et al.); *id.* at 35 (minority views of Sens. Durbin and Akaka).

establish an order of succession that includes Assistant Secretaries who are not Senate-confirmed for instances in which the offices of the Secretary, Deputy Secretary, and Under Secretary of Transportation for Policy are vacant); 40 U.S.C. § 302(b) (providing that the Deputy Administrator serves as Acting Administrator of General Services when that office "is vacant," "unless the President designates another officer of the Federal Government"); *cf*. 44 U.S.C. § 304 (limiting the individuals whom the President may choose to serve as Acting Director of the Government Printing Office to those who occupy offices requiring presidential appointment with the Senate's advice and consent).

Indeed, if it were unconstitutional for an official without Senate confirmation to serve temporarily as an acting agency head, then the recent controversy over the Acting Director of the CFPB should have been resolved on that ground alone—even though it was never raised by any party, the district court, or the judges at the appellate argument. On November 24, 2017, the Director of the CFPB appointed a new Deputy Director, expecting that she would become the Acting Director upon his resignation later that day. *Acting Director of CFPB*, 41 Op. O.L.C. __, at *2 n.1. The Director of the CFPB relied on 12 U.S.C. § 5491(b)(5), which expressly contemplates that a non-Senate-confirmed official (the Deputy Director) will act as a principal officer (the Director). The President, however, exercised his authority under 5 U.S.C. § 3345(a)(2) to designate the Director of OMB as Acting Director of the CFPB. *See English*, 279 F. Supp. 3d at 330. When the Deputy Director challenged the President's action, we are not aware that anyone ever contended that the Deputy Director was constitutionally ineligible to serve as Acting Director because she had not been confirmed by the Senate. If the newly installed Deputy Director of the CFPB could lawfully have become the Acting Director, then the Chief of Staff to the Attorney General may serve as Acting Attorney General in the case of a vacancy.

### D.

The constitutionality of Mr. Whitaker's designation as Acting Attorney General is supported by Supreme Court precedent, by acts of Congress passed in three different centuries, and by countless examples of executive practice. To say that the Appointments Clause now prohibits the President from designating Mr. Whitaker as Acting Attorney General would mean that the Vacancies Reform Act and a dozen statutes were

unconstitutional, as were countless prior instances of temporary service going back to at least the Jefferson Administration.

There is no question that Senate confirmation is an important constitutional check on the President's appointments of senior officers. The Senate's role "serves both to curb Executive abuses of the appointment power, and to promote a judicious choice of [persons] for filling the offices of the union." *Edmond*, 520 U.S. at 659 (internal quotation marks omitted). At the same time, the "constitutional process of Presidential appointment and Senate confirmation . . . can take time: The President may not promptly settle on a nominee to fill an office; the Senate may be unable, or unwilling, to speedily confirm the nominee once submitted." *SW General*, 137 S. Ct. at 935. Despite their frequent disagreements over nominees, for over 200 years, Congress and the President have agreed upon the value and permissibility of using temporary appointments, pursuant to limits set by Congress, in order to overcome the delays of the confirmation process.

If the President could not rely on temporary designations for principal offices, then the efficient functioning of the Executive Branch would be severely compromised. Because most Senate-confirmed officials resign at the end of an administration, a new President must rely on acting officials to serve until nominees have been confirmed. If Senate confirmation were required before anyone could serve, then the Senate could frustrate the appropriate functioning of the Executive Branch by blocking the confirmation of principal officers for some time. *See* 144 Cong. Rec. 27496 (Oct. 21, 1998) (statement of Sen. Thompson) (noting that section 3345(a)(3) had been added because "[c]oncerns had been raised that, particularly early in a presidential administration, there will sometimes be vacancies in first assistant positions, and that there will not be a large number of Senate-confirmed officers in the government," as well as "concerns . . . about designating too many Senate-confirmed persons from other offices to serve as acting officers in additional positions"). A political dispute with the Senate could frustrate the President's ability to execute the laws by delaying the appointment of his principal officers.

The problems with a contrary rule are not limited to the beginning of an administration. Many agencies would run into problems on an ongoing basis, because they have few officers subject to Senate confirmation. Thus, when a vacancy in the top spot arises, such an agency would either lack a head or be forced to rely upon reinforcements from Senate-confirmed appointees outside the agency. Those outside officers may be

inefficient choices when a non-Senate-confirmed officer within the agency is more qualified to act as a temporary caretaker. At best, designating a Senate-confirmed officer to perform temporary services would solve a problem at one agency only by cannibalizing the senior personnel of another.

It is true that these concerns do not apply to the current circumstances of the Department of Justice, which is staffed by a number of Senate-confirmed officers. Following Attorney General Sessions's resignation, the President could have relied upon the Deputy Attorney General, the Solicitor General, or an Assistant Attorney General to serve as Acting Attorney General. But the availability of potential alternatives does not disable Congress from providing the President with discretion to designate other persons under section 3345(a)(3) of the Vacancies Reform Act. Nothing in the text of the Constitution or historical practice suggests that the President may turn to an official who has not been confirmed by the Senate if, but only if, there is no appropriate Senate-confirmed official available.

### III.

The President's designation to serve as Acting Attorney General of a senior Department of Justice official who does not currently hold a Senate-confirmed office is expressly authorized by 5 U.S.C. § 3345(a)(3). Mr. Whitaker has been designated based upon a statute that permits him to serve as Acting Attorney General for a limited period, pending the Senate's consideration of a nominee for Attorney General. Consistent with our 2003 opinion, with *Eaton*, and with two centuries of practice, we advised that his designation would be lawful.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*
